UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on October 31, 2003

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | |
| HUMAYUN A. KHAN, | : | VIOLATIONS: |
| | : | |
| Defendant. | : | 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| | : | |
| | : | 50 U.S.C. §§ 1701-1706 |
| | : | (International Emergency Economic |
| | : |  Powers Act) |
| | : | |
| | : | 50 U.S.C. App. §§ 2401 *et seq.* |
| | : | (Export Administration Act) |
| | : | |
| | : | 15 C.F.R. Parts 730-774 |
| | : | (Export Administration Regulations) |
| | : | |
| | : | Executive Order 13222 |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |

**I N D I C T M E N T**

The Grand Jury charges that:

**COUNT ONE**

At all times material to this Indictment:

**INTRODUCTION**

1.	The defendant, **HUMAYUN A. KHAN**, was the owner and the chief executive

officer of Pakland PME Corporation ("Pakland"), which was located at Unit # 7&8, 2nd Floor, Muhammadi Plaza, F-6/4, Blue Area, Islamabad-44000, Pakistan. Pakland, among other things, engaged in the business of acquiring U.S. origin electronics products on behalf of purchasers in Pakistan.

2. Co-conspirator Asher Karni was the owner and principal operating officer of Top-Cape Technology ("Top Cape"), which was located at 109 Ocean View Drive, Green Point 8005, Cape Town, South Africa. Top-Cape, among other things, engaged in the business of importing U.S. origin electronics products to South Africa and then exporting those goods to other nations, including to Pakistan.

3. The United States Department of Commerce ("DOC"), located in the District of Columbia, was responsible for reviewing and controlling the export of certain goods and technologies from the United States to foreign countries. In particular, the DOC placed limitations on the export of such goods and technologies that it deemed could make a significant contribution to the military or nuclear potential of other nations and that could be detrimental to the foreign policy or national security of the United States. The DOC derived its authority to control such exports from the Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2401-2420; the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774; the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706; and successive Executive Orders signed by the President of the United States. Pursuant to these statutes and regulations, the DOC required individuals and companies seeking to export certain controlled commodities first to obtain an export license from the DOC in the District of Columbia. In addition, under these statutes and regulations, it was unlawful for an individual or company to export a commodity to a nation for which the DOC

required no export license and then to re-export the same commodity to a nation where exports of that commodity were subject to DOC approval. This practice was known as the transshipment of products.

4. Triggered spark gaps were high-speed electrical switches that were capable of sending synchronized, high-voltage electronic pulses. They had civilian applications, such as in a medical device known as a lithotripter, which was used to break up kidney stones. However, triggered spark gaps could also be used as detonating devices for nuclear weapons, as well as having other military applications.

5. The Model GP-20B was a type of triggered spark gap that Perkin Elmer Optoelectronics ("Perkin Elmer") of Salem, Massachusetts, manufactured. Perkin Elmer had previously purchased the Model GP-20B line of triggered spark gaps from a company known as EG&G.

6. The DOC required that any person or company seeking to export the Model GP-20B triggered spark gap to Pakistan obtain an export license. The DOC imposed this requirement because it had determined, as set forth in the EAR, that the distribution of the Model GP-20B triggered spark gaps to Pakistan posed nuclear proliferation risks.

7. Oscilloscopes were devices that displayed graphs of electrical signals. A user of the device could obtain the following types of information from the graphs that an oscilloscope created: the time and voltage values of a signal; the frequency of an oscillating signal; the "moving parts" of a circuit represented by the signal; the frequency with which a particular portion of the signal was occurring relative to other portions; whether or not a malfunctioning component was distorting the signal; and how much of a signal was direct current ("DC") or alternating current ("AC"). In the

field of nuclear weapons development, an oscilloscope had the following applications: measuring single-shot, full-scale nuclear tests; providing data on the safety, reliability, deliverability, and yield of a nuclear weapon; testing the effects of nuclear explosive blasts on weapons components and systems; and measuring the capabilities of components used for primer detonation.

8.  The Model TDS 3054B, the Model TDS 5054, the Model TDS 7154, and the Model TDS 784D were oscilloscopes that Tektronix, Inc. ("Tektronix"), of Beaverton, Oregon, manufactured.

9.  Pakland was an authorized distributor for Tektronix products in Pakistan.

10. The DOC required that any person or company seeking to export the Model TDS 3054B, the Model TDS 5054, the Model TDS 7154, and the Model TDS 784D oscilloscopes to Pakistan obtain an export license.  The DOC imposed this requirement because it had determined, as set forth in the EAR, that the distribution of these types of oscilloscopes to Pakistan posed nuclear proliferation risks.

11. The defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni knew that the DOC required licenses for the export to Pakistan of the Model GP-20B triggered spark gap and for the Models TDS 3054B, TDS 5054, TDS 7154, and TDS 784D oscilloscopes.  Moreover, since sometime around 1993, the defendant, **HUMAYUN A. KHAN**, and Pakland had participated in obtaining export licenses from the DOC for several models of Tektronix oscilloscopes, including, on at least one occasion, an export license for a Model TDS 3054B oscilloscope.

## THE CONSPIRACY

12. Beginning in or around August 2002 and continuing through in or around December 2003, in the District of Columbia and elsewhere, the defendant, **HUMAYUN A. KHAN**, co-

conspirator Asher Karni, and others known and unknown to the Grand Jury, knowingly and willfully combined, conspired, confederated, and agreed with each other to commit offenses against the United States and to defraud the United States, more particularly:

    a.    to violate IEEPA, the EAA, and the EAR by exporting and attempting to export controlled commodities from the United States to Pakistan without having first obtained export licenses from the DOC, located in the District of Columbia, and with knowledge that such commodities were destined for Pakistan, a country to which exports were controlled for foreign policy and national security purposes; and

    b.    to defraud the United States by obstructing, hampering, hindering, frustrating, defeating, impairing, and impeding by craft, trickery, deceit, and dishonest means the DOC of its lawful and proper government functions of reviewing and controlling exports from the United States to Pakistan of commodities that have nuclear weapons applications and whose distribution to Pakistan could be detrimental to the foreign policy and national security of the United States.

## MANNER AND MEANS OF THE CONSPIRACY

13.    The objects of the conspiracy were to be accomplished through the following manner and means, among others:

    a.    The defendant, **HUMAYUN A. KHAN**, through Pakland, would receive requests from entities in Pakistan to acquire on their behalf U.S. origin commodities whose export to Pakistan required a license.

    b.    Co-conspirator Asher Karni maintained a website on the internet for Top-Cape that touted the company's expertise in acquiring electronics goods for civilian and military applications.

  c. The defendant, **HUMAYUN A. KHAN**, would use electronic mail ("e-mail") and, on occasion, the telephone to contact co-conspirator Asher Karni and request Karni to obtain goods in the United States that the defendant, **HUMAYUN A. KHAN**, knew required licenses for export to Pakistan.

  d. Upon receipt of orders from the defendant, **HUMAYUN A. KHAN**, co-conspirator Asher Karni would make inquiries of suppliers as to the price and availability of the products that **KHAN** was seeking. When Karni learned from suppliers that those commodities required licenses from the DOC if their destination was Pakistan, Karni would falsely represent that the goods were destined for customers in South Africa. For the U.S. origin products that the defendant, **HUMAYUN A. KHAN**, sought to purchase through Karni, the DOC did not require a license for exports to South Africa.

  e. So as not to arouse suspicions with U.S. manufacturers that he was diverting controlled products to Pakistan without first obtaining an export license from the DOC, co-conspirator Asher Karni would use brokers in the United States to purchase such controlled commodities from the manufacturers.

  f. Co-conspirator Asher Karni would cause the brokers to ship the controlled goods via an air freight company to Top-Cape in Cape Town, South Africa. Upon receipt of the products in South Africa, Karni would re-export them to Pakistan via an air freight company to consignees that the defendant, **HUMAYUN A. KHAN**, designated. In payment for the goods, Karni would wire funds from South Africa to the accounts of his suppliers in the United States. At no time in this process would either **KHAN** or Karni obtain an export license from the DOC to permit shipment of the commodities to Pakistan.

g. The defendant, **HUMAYUN A. KHAN**, would cause the National Bank of Pakistan to open letters of credit with the Standard Bank of South Africa for the benefit of Top-Cape in order to provide a means of payment to Karni and Top-Cape for controlled U.S. origin goods delivered to Pakistan. When the goods arrived in Pakistan, **KHAN** would cause the National Bank of Pakistan to make payment to Top-Cape under the letters of credit established at the Standard Bank of South Africa.

h. After receiving payment to the Top-Cape account under the letters of credit described above, co-conspirator Asher Karni would wire commission payments to bank accounts in Pakistan that the defendant, **HUMAYUN A. KHAN**, designated.

## OVERT ACTS

14. In furtherance of this conspiracy, the defendant, **HUMAYUN A. KHAN**, and other co-conspirators committed overt acts, including but not limited to the following:

a. On or about August 9, 2002, the defendant, **HUMAYUN A. KHAN**, in an e-mail correspondence with co-conspirator Asher Karni, successfully solicited Karni to acquire Tektronix oscilloscopes on his behalf, but warned Karni to "[p]ls approach these cases carefully as all items are controlled."

b. On or about December 27, 2002, the defendant, **HUMAYUN A. KHAN**, sent a purchase order via facsimile to Top-Cape for the purchase of one Model TDS 3054B oscilloscope and related components purportedly for a Pakistani company known as M/S Four Seas Commercial Enterprise ("Four Seas").

c. On or about January 31, 2003, the defendant, **HUMAYUN A. KHAN**, caused the National Bank of Pakistan to open a letter of credit with the Standard Bank of South Africa in

the amount of $13,417.00 for the benefit of Top-Cape in order to provide payment to Top-Cape for the purchase of one Model TDS 3054B oscilloscope and related components for Four Seas.

      d.      In or around February 2003, co-conspirator Asher Karni contacted a broker in Israel with an affiliate in Plainview, New York, and placed an order for one Model TDS 3054B oscilloscope and related components.

      e.      On or about March 6, 2003, the defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni caused a broker in Plainview, New York, to ship one Model TDS 3054B oscilloscope and related components from New York City, New York, to Cape Town, South Africa, via an air freight company.

      f.      On or about March 26, 2003, the defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni caused an air freight company to ship one Model TDS 3054B oscilloscope and related components from Cape Town, South Africa, to the National Bank of Pakistan, Main Branch, in Islamabad, Pakistan, with the ultimate consignee of the package being Four Seas. Neither **KHAN** nor Karni obtained an export license from the DOC in the District of Columbia before re-exporting the Model TDS 3045B oscilloscope from South Africa to Pakistan.

      g.      On or about April 30, 2003, co-conspirator Asher Karni caused the Standard Bank of South Africa to wire approximately $968.01 to a bank account in Islamabad, Pakistan, designated by the defendant, **HUMAYUN A. KHAN**, as payment of **KHAN'S** commission for the sale of the Model TDS 3045B oscilloscope and related components to Four Seas.

      h.      On or about May 6, 2003, the defendant, **HUMAYUN A. KHAN**, placed an order worth approximately $1.3 million with co-conspirator Asher Karni for 22 Model TDS 7154 oscilloscopes, 14 Model TDS 784D oscilloscopes, and related components, purportedly on behalf

of a Pakistani company known as M/S Matrix Telecom Technologies ("Matrix").

    i. On or about May 20, 2003, the defendant, **HUMAYUN A. KHAN**, sent an e-mail message to co-conspirator Asher Karni informing him that Matrix had prepared paperwork for the purchase order and letter of credit for the sale of the oscilloscopes described in Overt Act "h" above.  In the same e-mail, **KHAN** also told Karni, "And a word of advice from the Guru . . . do not purchase all the items together and never contact Tektronix U.K. office!"

    j. On or about May 27, 2003, co-conspirator Asher Karni contacted a Tektronix representative in Vienna, Austria, seeking a price quotation for the Matrix oscilloscope order and informing the representative that the order was for a telecommunications company in Pakistan.

    k. On or about May 29, 2003, after receiving an e-mail inquiry from a Tektronix representative in Asia concerning whether **KHAN** was familiar with the Matrix order that Karni was attempting to place with Tektronix, the defendant, **HUMAYUN A. KHAN**, falsely replied: "I really don't think any Pakistani customer has such a budget and of course I would know if there is any telecom business in the air, but again there is no such demand that we know of.  I will of course keep a close watch if I hear anything."

    l. On or about May 30, 2003, the defendant, **HUMAYUN A. KHAN**, sent an e-mail message to co-conspirator Asher Karni to which he attached the correspondence he received from Tektronix and stated: "You're [sic] friends exposed our country, pls see that this does not get further, like our name, customer name, etc.  Appreciate it if you can play it 'safe' or we may lose this great opportunity."

    m. On or about June 4, 2003, the defendant, **HUMAYUN A. KHAN**, sent an e-mail message to co-conspirator Asher Karni requesting that Karni contact a Perkin Elmer sales agent in

France for the purpose of purchasing Model GP-20B triggered spark gaps and advising Karni "pls do not disclose the end destination."

  n. On or about June 17, 2003, after receiving an e-mail message from co-conspirator Asher Karni in which Karni informed him that, per the Perkin Elmer sales agent in France, the Model GP-20B triggered spark gaps needed an export license and that Karni was declining to pursue the deal further, the defendant, **HUMAYUN A. KHAN**, sent Karni an e-mail message stating, "I know it is difficult but thats [sic] why we came to know each other . . . Pls do look around for another source."

  o. On or about June 17, 2003, co-conspirator Asher Karni sent an e-mail message to the defendant, **HUMAYUN A. KHAN**, stating that he would continue to seek a source for the Model GP-20B triggered spark gaps.

  p. On or about June 27, 2003, co-conspirator Asher Karni sent an e-mail message to the defendant, **HUMAYUN A. KHAN**, offering to sell 200 Model GP-20B triggered spark gaps at a price of $950.00 per unit.

  q. On or about July 22, 2003, co-conspirator Asher Karni sent an e-mail message to a broker in Secaucus, New Jersey, requesting pricing information for the Model GP-20B triggered spark gaps.

  r. On or about July 29, 2003, the defendant, **HUMAYUN A. KHAN**, caused the National Bank of Pakistan to open a letter of credit with the Standard Bank of South Africa in the amount of $32,332.00 for the benefit of Top-Cape in order to provide payment to Top-Cape for the purchase of two Model TDS 5054 oscilloscopes and related components purportedly for a Pakistani company known as Al-Technique Corporation of Pakistan ("Al-Technique").

  s. On or about July 30, 2003, co-conspirator Asher Karni sent an e-mail message to a broker in Secaucus, New Jersey, in which he ordered two Model TDS 5054 oscilloscopes and related components for delivery to Top-Cape in Cape Town, South Africa.

  t. On or about July 31, 2003, the defendant, **HUMAYUN A. KHAN**, caused the National Bank of Pakistan to open a letter of credit with the Standard Bank of South Africa in the amount of $208,000.00 for the benefit of Top-Cape in order to provide payment to Top-Cape for the purchase of 200 Model GP-20B triggered spark gaps purportedly for a Pakistani entity known as the AJKMC Litheography Aid Society ("AJKMC").

  u. On or about August 12, 2003, co-conspirator Asher Karni sent an e-mail message to a broker in Secaucus, New Jersey, soliciting the broker's assistance in filling a portion of the Matrix order and in which Karni stated, "I have a new project for you, but we need to work this one very wisely, it is very important that they [Tektronix] will not know that it is coming to S.A."

  v. On or about August 24, 2003, the defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni caused a broker in Secaucus, New Jersey, to ship two Model TDS 5054 oscilloscopes and related components from New York City, New York, to Cape Town, South Africa, via an air freight company.

  w. On or about August 28, 2003, the defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni caused an air freight company to ship two Model TDS 5054 oscilloscopes and related components from Cape Town, South Africa, to the National Bank of Pakistan, Supermarket Branch, in Islamabad, Pakistan, with the ultimate consignee of the package being Al-Technique. Neither **KHAN** nor Karni obtained an export license from the DOC in the District of Columbia before re-exporting the two Model TDS 5045 oscilloscopes from South Africa to Pakistan.

x.      On or about September 15, 2003, the defendant, **HUMAYUN A. KHAN**, sent an e-mail message to co-conspirator Asher Karni inquiring about the delivery status of the Model GP-20B triggered spark gaps.

y.      On or about September 28, 2003, co-conspirator Asher Karni sent an e-mail message to the defendant, **HUMAYUN A. KHAN**, informing him that a shipment of 66 Model GP-20B triggered sparks was ready to leave the United States for South Africa.

z.      On or about October 3, 2003, the defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni caused a broker in Secaucus, New Jersey, to ship 66 Model GP-20B triggered spark gaps from New York City, New York, to Cape Town, South Africa, via an air freight company.

aa.     On or about October 19, 2003, the defendant, **HUMAYUN A. KHAN**, and co-conspirator Asher Karni caused an air freight company to ship 66 Model GP-20B triggered spark gaps from Johannesburg, South Africa, to the National Bank of Pakistan, Main Branch, in Islamabad, Pakistan, with the ultimate consignee of the package being AJKMC.  Neither **KHAN** nor Karni obtained an export license from the DOC in the District of Columbia before re-exporting the 66 Model GP-20B triggered spark gaps from South Africa to Pakistan.

bb.     On or about October 28, 2003, the defendant, **HUMAYUN A. KHAN**, caused the National Bank of Pakistan to transfer, pursuant to the letter of credit previously opened at the Standard Bank of South Africa, $69,438 into one of Top-Cape's accounts at the Standard Bank of South Africa as payment for the 66 Model GP-20B triggered spark gaps.

cc.     On or about October 30, 2003, co-conspirator Asher Karni caused an employee of Top-Cape to send an e-mail message to the defendant, **HUMAYUN A. KHAN**, informing Khan that

Top-Cape intended to ship the remaining Model GP-20B triggered spark gaps by the third week of November.

dd.     On or about November 7, 2003, co-conspirator Asher Karni caused the Standard Bank of South Africa to wire $5,940 into a Pakland account at the Civic Centre Branch of the Habib Bank in Islamabad, Pakistan, designated by the defendant, **HUMAYUN A. KHAN**, as payment of **KHAN'S** commission for the sale of the 66 Model GP-20B triggered spark gaps.

ee.     On or about November 18, 2003, the defendant, **HUMAYUN A. KHAN**, sent an e-mail message to co-conspirator Asher Karni informing Karni that the letter of credit for the Matrix deal had been extended an additional 90 days.

(**Conspiracy to Commit Offenses against the United States and to Defraud the United States**, in violation of Title 18, United States Code, Section 371)

### COUNT TWO

15.     Between on or about March 6, 2003, and on or about March 26, 2003, in the District of Columbia and elsewhere, the defendant, **HUMAYUN A. KHAN**, willfully exported and attempted to export one Model TDS 3054B oscilloscope from the United States to Pakistan, via South Africa, without first having obtained an export license from the United States Department of Commerce, located within the District of Columbia, and with knowledge that the oscilloscope was destined for Pakistan, a country to which exports are controlled for foreign policy and national security purposes.

(**Unlawful Export of Commodities**, in violation of Title 50 U.S.C. App., §§ 2401-2420, 15 C.F.R. §§ 736.2(b), 738, 738 Supp. 1, 742.3, 744.2, 764.2(a) through (e), and 774 Supp. 1, Category 3, 50 U.S.C. §§ 1701, 1702, and 1705, and Executive Order 13222; **Aiding and Abetting and Causing an Act to Be Done**, 18 U.S.C. § 2)

## COUNT THREE

16.     Between on or about August 24, 2003, and on or about August 28, 2003, in the District of Columbia and elsewhere, the defendant, **HUMAYUN A. KHAN**, willfully exported and attempted to export two Model TDS 5054 oscilloscopes from the United States to Pakistan, via South Africa, without having first obtained an export license from the United States Department of Commerce, located in the District of Columbia, and with knowledge that the oscilloscopes were destined for Pakistan, a country to which exports are controlled for foreign policy and national security purposes.

(**Unlawful Export of Commodities**, in violation of Title 50 U.S.C. App., §§ 2401-2420, 15 C.F.R. §§ 736.2(b), 738, 738 Supp. 1, 742.3, 744.2, 764.2(a) through (e), and 774 Supp. 1, Category 3, 50 U.S.C. §§ 1701, 1702, and 1705, and Executive Order 13222; **Aiding and Abetting and Causing an Act to Be Done**, 18 U.S.C. § 2)

## COUNT FOUR

17.     Between on or about October 3, 2003, and on or about October 19, 2003, in the District of Columbia and elsewhere, the defendant, **HUMAYUN A. KHAN**, willfully exported and attempted to export 66 Model GP-20B triggered spark gaps from the United States to Pakistan, via South Africa, without having first obtained an export license from the United States Department of Commerce, located in the District of Columbia, and with knowledge that the triggered spark gaps

were destined for Pakistan, a country to which exports are controlled for foreign policy and national security purposes.

(**Unlawful Export of Commodities**, in violation of Title 50 U.S.C. App., §§ 2401-2420, 15 C.F.R. §§ 736.2(b), 738, 738 Supp. 1, 742.3, 744.2, 764.2(a) through (e), and 774 Supp. 1, Category 3, 50 U.S.C. §§ 1701, 1702, and 1705, and Executive Order 13222; **Aiding and Abetting and Causing an Act to Be Done**, 18 U.S.C. § 2)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia